UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MAUREEN TAYLOR,<br><br>                    Plaintiff,<br><br>        v.<br><br>METROPOLITAN DEVELOPMENT<br>COUNCIL,<br><br>                    Defendant. | CASE NO. C22-5509-JCC-SKV<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Plaintiff Maureen Taylor brings this civil lawsuit against her former employer, Defendant Metropolitan Development Council, with claims of breach of employment agreement, wrongful termination in violation of public policy, and retaliation. Dkt. 1-2.[1] Plaintiff alleges she was bullied, harassed, and subjected to false allegations by her colleagues and that MDC refused to properly investigate, deliberately destroyed relevant video evidence, and refused to turn over

---

[1] MDC removed the case from Pierce County Superior Court and this Court denied MDC's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a). *See* Dkts. 1, 9, 15 & 18.

1    relevant records to her union.  *Id.*, ¶3.5.  She further alleges that, after she reported missing

2    controlled substances and over- and under-medicating of patients, MDC advised her of vague

3    staff complaints and, without explanation of the reason, placed her on unpaid leave.  *Id.*, ¶¶3.6-

4    3.7.  Plaintiff alleges the hostility and bullying continued upon her return to work and her request

5    for hours, back-pay, and benefits due, and that MDC then improperly terminated her

6    employment.  *Id.*, ¶¶3.8-3.9.

7         MDC now moves to dismiss all of Plaintiff's claims in a Motion for Summary Judgment.

8    Dkt. 50.  Plaintiff opposes the motion.  Dkt. 57.  The Court, having considered all of the briefing,

9    attachments, and the remainder of the record, recommends that MDC's summary judgment

10   motion be GRANTED and Plaintiff's claims DISMISSED.[2]

11                              BACKGROUND

12        MDC is a non-profit Community Action Agency providing programs and services

13   relating to behavioral health, substance abuse, and homelessness to individuals and families in

14   the City of Tacoma.  Dkt. 52, ¶3.  MDC's services include a Substance Abuse and Recovery

15   Program (the "Detox Unit") providing outpatient care and treatment to persons needing inpatient

16   detoxification and withdrawal management from drugs and alcohol.  *Id.*

17        Plaintiff holds a Practical Nursing License.  Dkt. 57-1, ¶2.  She also has a certification in

18   Chemical Dependency Counseling and Family Services, and many years of experience working

19   in the areas of mental health and chemical dependency.  *Id.*, ¶¶2-3, 25 & Ex. 7.  Plaintiff began

20   her employment with MDC on October 30, 2017, working as a Licensed Practical Nurse (LPN)

21   for the Detox Unit on the swing shift.  Dkt. 52, ¶¶3, 5.  As an LPN, Plaintiff's responsibilities

22

23        [2] In its motion, MDC sought to dismiss all of Plaintiff's claims or, in the alternative, partial summary
     judgment limiting Plaintiff's damages due to her failure to mitigate.  Dkt. 50.  The Court subsequently denied MDC
     leave to amend its Answer to include an affirmative defense of failure to mitigate.  Dkt. 58.  The Court, accordingly,
24   does not herein address MDC's alternative argument for partial summary judgment.

REPORT AND RECOMMENDATION - 2

included, *inter alia*, admitting new patients, providing treatment consistent with physician orders, administering medications, charting patient information, and recording quantities of controlled substances at the beginning and end of each shift. *Id.*, Ex. 2; Dkt. 57-1, ¶3.

Throughout her employment, Plaintiff belonged to a union and her employment was governed by a collective bargaining agreement (CBA). Dkt. 52, ¶¶13-14 & Exs. 6-7; Dkt. 57-1, ¶4. Plaintiff signed MDC's Employee Ethical Standard/Rules (hereinafter "Code of Ethics"), which provides that all MDC clients and service recipients are to be treated with dignity and respect and that violations may result in the termination of employment. Dkt. 52, Ex. 3. She also signed an acknowledgment of her responsibility to read MDC's Employee Handbook, which prohibits the use of abusive, bullying, coercive, or threatening language or other unprofessional communications and conduct. *Id.*, Ex. 1; Dkt. 57-1 at 71.

MDC initially found Plaintiff's job performance satisfactory. A performance evaluation dated May 1, 2018 assessed Plaintiff as meeting or significantly above standards in all categories assessed, described her as very motivated and a team player, and identified as a strength: "shows professionalism to both clients and fellow staff." Dkt. 57-1 at 113-17.

MDC began to receive written reports regarding Plaintiff in mid-2019.[3] Specifically, on May 4, 2019, MDC employee Laura Hammer-Schoville reported that Plaintiff was improperly deferring patient admissions to the day shift and expressed frustration that nothing was being done "despite numerous complaints from staff[,]" and, on June 25, 2019, an employee reported Plaintiff's involvement in a conflict over an admission, after which Plaintiff yelled, "Fuck you and the [horse] you rode in on[.]" Dkt. 52, Exs. 8-9. Allen Jacobson, an MDC Labor Relations

---

[3] The background set forth herein is supported by documentation provided in relation to the pending dispositive motion and facts agreed upon in the parties' submissions. To the extent the parties dispute or provide context to the documentation, their assertions are included in the discussion of Plaintiff's claims below.

Specialist, forwarded the second complaint to Leslie Liddle, a union representative, and stated that others had had difficulties with Plaintiff. *Id.*, Ex. 9. Jacobson noted his intention to hold a "Weingarten" meeting, meaning an investigatory interview that could lead to discipline and is held with a representative of the employer, the employee, and the employee's union representative. *Id.*

On July 3, 2019, Troy Christianson, MDC Interim Director of Inpatient Behavioral Health, reported that Plaintiff was "causing some additional problems with other staff in Detox[,]" and asked for an update on the investigation. *Id.*, Ex. 10. On July 16, 2019, Hammer-Schoville requested assistance in dealing with Plaintiff, stating Plaintiff "had basically stopped talking to" her and appeared to have a "vendetta" against her. *Id.*, Ex. 12. She asserted Plaintiff told others to leave urine samples for Hammer-Schoville to clean up and to not fix a mistake she made in entering a client's medication. *Id.* (also stating: "I could mention many, many times she has passed on work to other shifts, been rude and petty to the point that other nurses will not work with her, but I will keep this just about her and I, unless you want more information about this.") On July 24, 2019, MDC conducted a Weingarten meeting, wherein Jacobson gave Plaintiff verbal counseling about her conduct. *Id.*, ¶¶7, 20.

On September 2, 2019, a patient filed a grievance alleging Plaintiff had been disrespectful, stating: "I felt belittled [and] she talked to me like an animal [and] not a person." *Id.*, Ex. 13. On September 4, 2019, an employee reported that Plaintiff called her at home and asked about another employee's hours. *Id.*, Ex. 14. Another employee reported, on September 13, 2019, that Plaintiff gave a patient a "hard time" about showing up late for his admission, and, on September 20, 2019, that Plaintiff seemed "obsessed" with whether other employees had the

1   same number of admissions every shift, going so far as to ask an aid to make calls at 2:00 a.m. to

2   try and find a new admission. *Id.*, Exs. 15-16.

3       Jacobsen scheduled a second Weingarten meeting to occur in October 2019 and, in

4   advance of the meeting, requested that MDC Manager Jerome Walters outline his concerns about

5   Plaintiff. *Id.*, Ex. 17. Walters provided Jacobson with statistics from the month prior showing a

6   lack of intakes/new admissions during the swing shift. *Id.* Walters stated that patients were told

7   to delay their admissions, that intake appointments were either canceled or rescheduled after

8   phone calls by Plaintiff, that a scheduler "had been intimidated out of scheduling intakes" for the

9   shift, and that it was "demoralizing behavior for the team." *Id.*

10      MDC held a second Weingarten meeting on October 16, 2019. *See id.*, ¶¶7, 21-22. On

11  October 20, 2019, a patient filed a grievance stating Plaintiff "would not give me my

12  belongings[,] laughed when I got upset, and made me feel like she thought it was a joke that I

13  really needed my stuff." *Id.*, Ex. 18. On December 5, 2019, an employee reported Plaintiff

14  stated she "hated her job" while doing an admission, and that the client felt uneasy and did not

15  want Plaintiff to admit her. *Id.*, Ex. 19. On December 12, 2019, an employee reported that

16  Plaintiff yelled at a patient who complained about chest pain and told the patient he did not need

17  hospitalization. *Id.*, Ex. 20.

18      In an email dated December 17, 2019, Plaintiff reported to Walters that, on December

19  13th, she discovered a failure to account for four missing capsules of medication. *Id.*, Ex. 12.

20  On the day of the incident described, Hammer-Schoville quit, walking off the job and leaving

21  another employee and then Plaintiff to cover a shift. *Id.* Plaintiff stated:

22          With 3 nurses changing hands, and not counting controlled substances at the
            change of hands, this is not acceptable in the nursing profession. I, by law, should
23          not have taken the medication room keys without the count being correct. With
            controlled substances, they have to be accounted for, before the next nurse takes

24

responsibility.  Each time the medication keys exchange hands/responsibility, there has to be accountability for the medications that are given.

*Id*.

On December 18, 2019, MDC held a third Weingarten meeting.  *Id.*, ¶¶7, 28.  On that same day, MDC placed Plaintiff on administrative leave pending the outcome of an investigation into allegations of workplace misconduct.  *Id.*, ¶28 & Ex. 23.

MDC received three additional employee reports during Plaintiff's administrative leave.  An employee reported that Plaintiff, *inter alia*, misgendered him repeatedly, commented on an employee's pregnancy, and stated with respect to another employee, "'Dana is a big fat black woman.  You can't miss her.'"  *Id*., Ex. 24.  Another employee described an incident in which a female patient appeared for admission on the swing shift, was not admitted, and slept on a bench in the hall outside the unit the entire night.  *Id*., Ex. 25.  This same employee stated: "Several times, if she worked late she would call off for the next shift."  *Id*.  A third employee reported that Plaintiff once "pushed a door so hard behind me that it nearly hit my head[,]" and had disrespected her on many other occasions.  *Id*., Ex. 26.

In conducting the investigation into the complaints against Plaintiff, Jacobson requested documentation from Walters, but Walters did not provide any evidence.  *Id.*, Ex. 5 at 71:21-72:7; Dkt. 57-1, ¶88.  Walters, during this same period, took vacation and then terminated his employment.  *See id.*  Finding no evidence of corroboration for the allegations raised, Jacobson concluded the investigation and brought Plaintiff back from leave.  Dkt. 52, Ex. 5 at 70:15-73:18.  Plaintiff resumed work on January 3, 2020.  *Id.*, ¶29.

MDC received more complaints about Plaintiff in February 2020.  First, a patient filed a grievance stating that the "nurse who admitted me last night . . . was very rude and

1   unprofessional . . . yelled at me and just treated me bad[.]" *Id.*, Ex. 28 (February 6, 2020); *see*

2   *also* Dkt. 50 at 7, n.35.  Second, both a patient and employee reported that Plaintiff put a patient

3   to bed wearing clothes in which the patient had defecated, and another patient described

4   Plaintiff's behavior as "very rude and unprofessional."  Dkt. 52, Exs. 29, 35 (February 10, 2020),

5   Ex. 33 (undated report regarding events occurring between February 6-13, 2020), & Ex. 35

6   (February 10, 2020).  Third, in two additional grievances, one patient stated Plaintiff argued

7   about whether he needed a prescribed medication, while another described Plaintiff as "very rude

8   with people[.]" *Id.*, Exs. 31-32 (February 12, 2020).  Finally, an employee reported that Plaintiff

9   continued to misgender him, made comments about other employees' accents/pronunciations,

10  was rude and disrespectful to patients, and told a patient experiencing withdrawal symptoms to

11  take his own pulse.  *Id.*, Ex. 33 (see above) & Ex. 36 (February 21, 2020).

12         In this same month, Joe Contris, MDC Deputy Director of Behavioral Healthcare, twice

13  emailed Jacobson with concerns about Plaintiff.  On February 11, 2020, Contris described an

14  employee as expressing concerns about Plaintiff that were "severe and consistent with what we

15  are hearing and seeing[,]" and stated:  "I am being handicapped in improving Detox with this

16  staff member continuing her approach to the work and to our guests." *Id.*, Ex. 30.  On February

17  14, 2020, Contris described interactions with two patients, one of whom reported that Plaintiff

18  told him to take his own pulse and the other of whom was "upset and angered" that Plaintiff

19  woke him up by bringing a new patient into his room "in a very disruptive and antagonizing

20  manner." *Id.*, Ex. 34.  Contris stated:

21         . . . I am very concerned about Maureen's continued and apparently escalating
           (based on recent numerous written and verbal grievances and complaints)
22         unprofessional, demeaning, and triggering behaviors directed towards our Guests.
           I have been a leader of many healthcare teams for nearly 3 decades and I have
23         never seen such sustained, focused, and consistently themed complaints/
           grievances against a healthcare staff member.  It is unprecedented for me.  I do

24

1    worry about any liability we may have if a Guest responds in an aggressive
manner given we have at least 6 Grievances about her upsetting ways of
2    interacting with Guests. Further, our reputation in the community is most likely
being damaged one disgruntled Guest at a time.

3

4    *Id*. Contris asked that it be "on record" that he did "<u>not</u> support [Plaintiff's] continued presence

5    on the unit." *Id*. (emphasis in original).

6        MDC held a final Weingarten meeting with Plaintiff on February 18, 2020. *See id*., Ex.

7    38. As described by Contris, the allegations against Plaintiff were reviewed and refuted by

8    Plaintiff, who "became more and more agitated, escalated, and verbally hostile in her language

9    and her tone." *Id*. Contris was concerned Plaintiff lacked the skill to recognize cues of social

10    interactions and the needs of MDC's patients, and troubled by her "triggering, caustic, and

11    offensive interpersonal style and her unwillingness or inability to have any self-reflection or

12    openness to the Guests or staffs' written and verbal grievances and complaints." *Id*.

13        MDC terminated Plaintiff's employment on February 21, 2020. *Id*., Ex. 37. Contris

14    explained the decision in an Employee Disciplinary Action Form as follows:

15        MDC investigated multiple complaints and grievances from co-workers and
guests about unprofessional, inconsiderate and mean spirited behavior and
16        comments by Ms. Taylor that contributes to a negative work environment[.]
MDC believes that the complaints by staff and guests concerning patient neglect
17        by Ms. Taylor has merit. It was alleged that Ms. Taylor would often not complete
guest intakes and leave them for the next shift. O[n] at least one occasion, Ms.
18        Taylor did not start the intake process and the guest was left unattended and
uncared for until the next morning since the night shift nurse was an Agency
19        Nurse that cannot do intakes. On February 10, 2020 Ms. Taylor put a guest back
into bed covered with feces, prompting a grievance from a guest and staff. Ron
20        Wilkins, CDP in Detox informed MDC that Ms. Taylor discharged a patient that
was in active withdrawals on February 5, 2020.

21

22        Ms. Taylor's neglect of guests and failure to complete patient admits is a violation
of MDC Detoxification Policy and Procedure (Section 4 Admission of Patients
23        Policy). Ms. Taylor's negative comments, lack of empathy and inappropriate
behavior is unprofessional and inconsiderate. It is especially damaging to
24        vulnerable guests dealing with recovery. It makes her co-workers uncomfortable

1    and negatively affects the work environment[.]  MDC's Code of Ethics states:
     "employees are expected to maintain professionalism in all of their workplace
2    communications, individuals should engage in productive, collegial and
     supportive communication.["] . . .  MDC has determined that these allegations
3    have merit.  . . .

4    *Id*.

5        After Plaintiff's termination, in a "memo to file", Jacobson documented a conversation he

6    held with a patient on March 2, 2020.  *Id.*, Ex. 39.  The patient reported that, in November 2019,

7    Plaintiff "made her wait in the hallway the entire night with an older male[,]" and that she and

8    the older male proceeded to use drugs while awaiting admission.  *Id.*

9        On March 5, 2020, the union filed a Step 2 grievance of Plaintiff's termination, asking

10   that Plaintiff "be made whole in every manner including, but not limited to:  reinstatement to

11   [her] former position with all terms and conditions of employment restored."  *Id.*, Ex. 41; Dkt.

12   57-1, Ex. 1.  On the same day, Plaintiff emailed Liddle, stating: "I want to call those [December

13   2019] medication errors into the state department.  Is that still o.k.?"  Dkt. 52, Ex. 40.

14       On March 9, 2020, Plaintiff filed complaints with Jacobson about two MDC employees.

15   Dkt. 57-1, Ex. 14.  She identified deficiencies in the work performance of Doris Tucker, a day

16   shift employee, and alleged Tucker took offense to Plaintiff's sufficient work performance and

17   endeavored to get her fired by repeatedly raising false allegations against her.  *Id.*  She alleged

18   Tucker encouraged first Hammer-Schoville, then other employees, and ultimately patients to join

19   her efforts, and asserted an absence of any documentation or other evidence to support the false

20   allegations.  *Id.*  Plaintiff also filed a complaint against Alyssa Tiner, an MDC Insurance

21   Coordinator, describing incidents in February 2020 in which Tiner inaccurately reported

22   Plaintiff's failure to properly complete paperwork.  *Id.*  Jacobson advised Plaintiff he would

23   investigate her complaints.  *Id.*  On March 19, 2020, Plaintiff filed a complaint against Jacobson

24

1  and Denise Wells, a payroll employee, describing her months-long effort to recover backpay and

2  benefits after her administrative leave. *Id.*, Ex. 13.

3      MDC denied the union's Step Two grievance. *See* Dkt. 52, ¶39 & Ex. 42.  In a letter

4  dated July 25, 2020, Contris rejected assertions that the investigation was incomplete or

5  otherwise improper, and stated that staff morale and the work atmosphere in the Detox Unit had

6  improved significantly since Plaintiff's termination. *Id.*

7      The union elevated the grievance to Step 3 on August 11, 2020. *Id.*, ¶40 & Ex. 43.  MDC

8  thereafter, internally and with Liddle, discussed a possible reinstatement in MDC's Mental

9  Health Unit, located across the hall from the Detox Unit.  Dkt. 57-1, Ex. 2 at 95:3-99:19.  MDC

10 submits screen shots of text exchanges purporting to show that Liddle conveyed and Plaintiff

11 rejected this offer.  Dkt. 52, ¶41 & Ex. 46.  MDC did not, however, ever formally make this or

12 any other reinstatement offer to Plaintiff.  Dkt. 57-1, Ex. 2 at 95:3-99:19.  Also, while Plaintiff

13 and Liddle were pursuing a potential arbitration with MDC at least as late as May 2021, neither a

14 Step 3 hearing, nor arbitration took place. *Id.*, ¶¶14, 102-05 & Ex. 3.

15     On November 10, 2022, Washington's Department of Health (DOH) notified MDC of an

16 investigation into its activities as a result of a complaint.  Dkt. 52, Ex. 44.  On July 5, 2023, the

17 State advised no deficiencies would be cited as a result of a completed investigation. *Id.*, Ex. 45.

18                              <u>LEGAL STANDARD</u>

19     Summary judgment is appropriate when there is no genuine issue of material fact and the

20 moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party seeking

21 summary judgment must inform the Court of the basis for its motion, and identify the portions of

22 the pleadings, discovery responses, or other materials that demonstrate the absence of a genuine

23 issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

24

1    Where the moving party will have the burden of proof on an issue at trial, the movant

2    must affirmatively demonstrate that no reasonable trier of fact could find other than for the

3    movant. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the non-

4    moving party will have the burden of proof at trial, the moving party can carry its initial burden

5    by either producing evidence that negates an essential element of the non-moving party's claim,

6    *or* by establishing the absence of evidence to support an essential element of the non-moving

7    party's claim. *See James River Ins. Co. v. Herbert Schenk, P.C.*, 523 F.3d 915, 923 (9th Cir.

8    2008); *Soremekun*, 509 F.3d at 984 (citing *Celotex Corp.*, 477 U.S. at 323); *Nissan Fire &*

9    *Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then

10    shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec.*

11    *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

12    In determining whether an issue of fact exists, the Court must view all evidence in the

13    light most favorable to the nonmoving party and draw all reasonable inferences in that party's

14    favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co.*,

15    475 U.S. at 587. A genuine issue of material fact exists where there is sufficient evidence for a

16    reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is

17    "whether the evidence presents a sufficient disagreement to require submission to a jury or

18    whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

19    In supporting a factual position, a party must "cit[e] to particular parts of materials in the

20    record . . .; or show[] that the materials cited do not establish the absence or presence of a

21    genuine dispute, or that an adverse party cannot produce admissible evidence to support the

22    fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that

23    there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S.

24

at 585.  "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

<u>DISCUSSION</u>

MDC argues that all of Plaintiff's claims should be dismissed on summary judgment. Plaintiff argues that genuine issues of material fact exist in relation to all three of her claims and preclude summary judgment.

A.    <u>Breach of Employment Agreement</u>

In asserting a cause of action for breach of employment agreement, Plaintiff alleges MDC breached the CBA by terminating her "without cause and without benefit of progressive discipline and contrary to how similarly situated employees were treated." Dkt. 1-2, ¶4.3.  MDC argues it properly terminated Plaintiff for just cause and with progressive discipline.  MDC also accurately observes that Plaintiff does not identify any "similarly situated" employees or address her claim of differential treatment.  The Court, as such, considers below only the addressed and disputed just cause and progressive discipline aspects of Plaintiff's claim.

1.    <u>Just Cause</u>:

Plaintiff worked under a CBA.  A CBA is a contract that is properly interpreted according to ordinary principles of contract law, and "'where the words of a contract in writing are clear

and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.'" *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (citation omitted). The CBA governing Plaintiff's employment provides that an employee will not be discharged without "just cause", and that just cause "may include the concept of progressive discipline such as verbal and written discipline, suspension without pay, or other discipline[.]" Dkt. 52, Ex. 6 at 19. It further provides that employees "agree to comply with MDC's published work rules and code of conduct." *Id*. MDC's Code of Ethics provides, in relevant part, that all MDC clients and recipients of its services "be treated with dignity and respect." *Id*., Ex. 3 at 1.

The CBA does not define just cause. *See id.*, Ex. 6 at 19. However, just cause has been defined by the Washington Supreme Court as "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power." *Baldwin v. Sisters of Providence in Washington, Inc.*, 112 Wn.2d 127, 139, 769 P.2d 298 (1989). Further, "a discharge for 'just cause' is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." *Id. See also Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 438, 815 P.2d 1362 (1991) (just cause may be found where an employer reached a good faith and reasonable conclusion and that conclusion is supported by substantial evidence).

MDC notes that Plaintiff agreed to abide by its Code of Ethics and acknowledged her receipt and review of MDC's Employee Handbook, the latter of which contains rules regarding employee conduct. Dkt. 52, Exs. 1 & 3; Dkt. 57-1 at 71. MDC states that it serves a vulnerable population of clients seeking counseling and medical assistance in withdrawing from drugs and alcohol. MDC argues Plaintiff's unprofessional conduct and treatment of patients and her co-

workers, as demonstrated by the numerous complaints raised against her, violated its Code of Ethics and rules of conduct, providing just cause for her termination.

Plaintiff disputes the existence of just cause, asserting her satisfactory job performance and an absence of context provided in MDC's characterization of events. As explained by Plaintiff, from January through mid-September 2019, the Detox Unit lacked a nursing manager and the absence of oversight caused conflict. Dkt. 57-1, ¶27. Plaintiff raised issues with her co-workers' deficiencies and harassment, while day shift employees made false accusations about her work performance, ethics, and professionalism. *Id.*, ¶¶27-31.

Plaintiff either denies or concedes but provides context for the complaints of her coworkers. For example, Plaintiff denies "deferring admissions", but concedes she inquired about a new admission for a co-worker based on Walters' instruction to have two admissions scheduled per shift, and denies giving a "hard time" to a patient who was not admitted when he arrived late, while conceding she had to repeat herself "many times[.]" *Id.*, ¶¶46-47, 60-67. She denies either purposely misgendering or making any inappropriate comments about her co-workers, *id.*, ¶¶69-79, 89, concedes she expressed frustration with a co-worker but denies using vulgarity, *id.*, ¶¶48-49, and concedes allegations about a urine sample and transcription error, stating these were frequent problems, not corrected despite her prior complaint, *id.*, ¶¶52-55.

Plaintiff denies ever treating a patient improperly or with disrespect, explaining circumstances associated with grievances as inaccurate and reflecting displeasure with necessary procedures or events outside of her control. *Id.*, ¶¶57-58, 60-65, 89. With regard to the patient reporting chest pain, Plaintiff states that day shift employees discussed the complaints for hours before Plaintiff arrived at work, without sending the patient to the hospital, and that she reached the same conclusion with consideration of the patient's history of extreme anxiety. *Id.*, ¶¶80-82.

1  She denies she bore responsibility for the failure to admit a female patient who remained in a

2  hallway overnight or that she failed to clean up a patient who allegedly had feces in her clothing.

3  *Id.*, ¶¶83-87, 89.

4      Plaintiff asserts that she was not given a reason for the decision to place her on

5  administrative leave and that, at the time, Walters told her: "'If it were up to me, it wouldn't have

6  happened this way.'" *Id.*, ¶¶88, 90-91.  She asserts that, on her return from leave, she faced

7  continued harassment and difficulty in restoring her backpay and benefits, and that she was

8  subsequently terminated without any investigation into her report of missing controlled

9  substances.  *Id.*, ¶93.  Plaintiff argues the temporal proximity of her report of missing controlled

10  substances and the handling of her employment shows breaches in MDC's investigations and the

11  arbitrary handling of her employment status.

12      As reflected above, Plaintiff relies almost entirely on her declaration to establish a

13  genuine issue of material fact.  *See* Dkts. 57 & 57-1.  She also relies on her report of missing

14  controlled substances, Jacobson's testimony acknowledging that she at some point reported

15  harassment by other employees, and grievances she filed after her termination.  *See* Dkt. 52, Exs.

16  5 & 22.  In explaining the absence of other evidentiary support, Plaintiff contends MDC deleted

17  video evidence of her interactions with patients and failed to provide documents requested in

18  discovery.  Dkt. 57-1, ¶¶9, 11, 44, 89-91.[4]

19      As the nonmoving party, Plaintiff is entitled to have all evidence viewed in the light most

20  favorable to her and to have all reasonable inferences drawn in her favor.  However, even with

21

---

22      [4] Jacobson testified he investigated Plaintiff's report of harassment by interviewing her co-
   workers and did not find any corroboration.  Dkt. 52, Ex. 5 at 52:18-56:23.  The Court also notes that,
23  while Plaintiff asserts MDC withheld evidence of her reports, the only evidence of a report she made
   during her employment came from her personal email account.  *Id.*, Ex. 22 (email from
24  tmaure2@aol.com).

1    that deference, the Court finds no genuine issue of material fact on the existence of just cause for

2    Plaintiff's termination.

3         MDC provides numerous patient grievances and staff complaints to support the

4    termination of Plaintiff's employment based on her failure to treat MDC patients with dignity

5    and respect or to conduct herself professionally in her interactions with patients and staff.

6    Plaintiff concedes some allegations of unprofessional conduct, such as the fact that she purposely

7    left urine in a utility room for a co-worker to clean up and directed another employee to leave a

8    medication error in a patient's chart. Dkt. 57-1, ¶¶52-55. She partially concedes numerous other

9    allegations, such as her failure to admit a patient who arrived late, that she misgendered a co-

10   worker and discussed the medical conditions of others, and her failure to send a patient to the

11   hospital despite his repeated complaints of chest pain. *See id.*, ¶¶60-82.

12        In denying some allegations, Plaintiff fails to adequately account for corroborating

13   evidence. For example, with respect to the patient with feces in her clothing, Plaintiff asserts

14   that she did not observe any feces and that Jacobson "conveniently" allowed for the deletion of

15   video purporting to support this allegation. *See* Dkt. 57 at 9-10 & Dkt. 57-1, ¶89.[5] Jacobson

16   testified that he observed feces on the patient in video surveillance that was on a "loop" and later

17   re-used and recorded over. Dkt. 52, Ex. 5 at 75:9-94:1. However, even without consideration of

18   that testimony, the record contains corroborating evidence in the form of both a patient grievance

19   and a report from an employee present during the incident. *Id.*, Ex. 29 at 3 & Ex. 33.

20

21

22

23        [5] Plaintiff also accuses Jacobson of making a series of "verifiable misrepresentations" in his
     deposition. Dkt. 57 at 9-10. However, her arguments lack clarity and evidentiary support. *See, e.g., id.*
     (referring to but not providing police reports, public records, and discovery in accusing Jacobson of lying
24   about a stolen laptop and backpack).

Plaintiff also asserts that day shift employees and a managerial employee encouraged patients to write grievances and employees to fabricate complaints. Dkt. 57 at 7. She asserts that the February 2020 grievances and complaints were "compiled within an eight-day period" and instigated by Doris Tucker, the "main instigator" of her harassment and bullying. Dkt. 57-1, ¶¶29-30, 38-39 (emphasis removed). However, her assertions as to the solicitation of grievances and fabrication of complaints appear to be no more than speculative.[6]

It is, moreover, indisputable that a large number of patients and staff, including two managerial employees, reported Plaintiff's disrespectful behavior and unprofessional conduct. *See*, *e.g.*, Dkt. 52, Ex. 17 (describing "demoralizing behavior") & Ex. 24 (expressing concern about Plaintiff's "unprofessional, demeaning, and triggering behavior" towards patients and the "unprecedented" number of "consistently themed/grievances against a healthcare staff member.") Although an employer "may not make arbitrary determinations of just cause, whether the plaintiff actually committed the violation is irrelevant; the question is whether 'at the time plaintiff was dismissed defendant reasonably, in good faith, and based on substantial evidence believed plaintiff' had committed the violation." *Wlasiuk v. Whirlpool Corp.*, 81 Wn. App. 163, 177-78, 914 P.2d 102 (1996) (quoting *Gaglidari*, 117 Wn.2d at 438)*, modified on other ground*s, 932 P.2d 1266 (Wash. Ct. App. 1997). Plaintiff, while disputing many of the allegations raised against her, fails to show a genuine issue of material fact as to MDC's reasonable, good faith belief that the allegations were true.

Plaintiff, finally, does not identify a genuine issue of material fact with respect to just cause through the temporal proximity between her report of missing controlled substances and

---

[6] In addition, Plaintiff both asserts that Jacobson allowed Tucker to sit in on interviews about the harassment and bullying, and acknowledges Tucker's role as a union steward. Dkt. 57-1, ¶30 (describing Tucker as the Chief Shop Steward).

1  MDC's employment decisions.  The undisputed evidence shows that MDC brought Plaintiff

2  back from administrative leave when an investigation failed to yield corroboration for allegations

3  raised against her and only later terminated her employment after receiving additional complaints

4  and finding corroborating evidence.  *See, e.g.*, Dkt. 52, Ex. 37.

5         In sum, Plaintiff at best disputes some of the disrespectful behavior and unprofessional

6  conduct identified by MDC as the reason for her termination.  Plaintiff does not provide

7  significant, probative evidence undermining MDC's showing that it reasonably, in good faith,

8  and with the support of substantial evidence concluded she failed to treat MDC patients with

9  dignity and respect or to conduct herself professionally.  Plaintiff thus fails to show a genuine

10  issue of material fact on the issue of just cause for her termination.

11         2.    <u>Progressive Discipline</u>:

12         In support of her claim that MDC terminated her without the benefit of progressive

13  discipline, Plaintiff appears to argue that any incidents or issues addressed in the first three

14  Weingarten meetings were necessarily fully resolved at the conclusion of those meetings, and

15  that MDC improperly considered prior resolved incidents and issues in the fourth Weingarten

16  meeting and in terminating her employment.  *See* Dkt. 57 at 7-8.  MDC deems this argument

17  both difficult to understand and specious.  MDC asserts that Weingarten meetings are

18  progressive disciplinary procedures.  MDC further asserts that it complied with the CBA's

19  progressive discipline provision by holding three Weingarten meetings before placing Plaintiff

20  on a brief administrative leave to investigate her performance deficiencies, and by holding a

21  fourth and final meeting after she returned from leave and MDC received additional grievances

22  and complaints.

23

24

1    Plaintiff does not cite to a specific CBA provision or to any legal authority to support her

2    argument.  Nor does the Court find support with consideration of the CBA.  That is, the CBA

3    provides only that an employee will not be discharged without just cause, and that just cause

4    "*may* include the concept of progressive discipline such as verbal and written discipline,

5    suspension without pay, or other discipline[.]"  Dkt. 52, Ex. 6 at 19 (emphasis added).[7]

6    Moreover, evidence before the Court shows MDC held three Weingarten meetings with

7    Plaintiff and her union representative to discuss patient grievances and employee reports

8    regarding her behavior and work performance, and offered her verbal counseling before placing

9    her on administrative leave; brought Plaintiff back from leave after finding an absence of

10    corroborating evidence; held a fourth Weingarten meeting after receiving additional grievances

11    and complaints; and terminated her employment upon finding that allegations raised against her

12    had merit.  Given this evidence, the Courts finds no genuine issue of material fact in relation to

13    progressive discipline.  For this reason and for the reasons stated above, MDC is entitled to

14    dismissal of Plaintiff's breach of employment agreement claim on summary judgment.

15    B.    Retaliation

16    Plaintiff's retaliation claim is considered pursuant to the Washington Law Against

17    Discrimination (WLAD), which prohibits retaliation against employees who oppose

18

19    ───────────────

20    [7] The employee handbook also contains discretionary language regarding progressive discipline.
Dkt. 52, Ex. 1 at 13 ("When circumstances warrant, MDC may issue any corrective actions as appropriate
relating to an employee's work performance or behavior.  This policy offers a general guideline for what
21    types of corrective action may be identified in resolving job performance problems or work rule
violations.  The actual corrective action issued or progression, if any, is at the discretion of MDC, and
22    generally depends upon the severity of the program or rule infraction, the employee's work history, along
with other considerations and pertinent information as determined relevant by MDC.  When a work
problem arises your supervisor initially should discuss the issue with you to improve the situation and/or
23    engage in problem solving.  However, depending on the situation or if a work or performance problem
persists, the supervisor may choose to issue other corrective action, e.g., verbal warning, written warning,
24    suspension, demotion, transfer, or termination of employment.")

discriminatory practices.  RCW 49.60.210(1).  Because direct evidence of discriminatory animus is rare, an employee may rely on "circumstantial, indirect, and inferential evidence to establish discriminatory action."  *Mikkelsen v. Pub. Util. Dist. No. 1*, 189 Wn.2d 516, 526, 404 P.3d 464 (2017) (citation omitted).  With such evidence, the Court employs the *McDonnell Douglas*[8] burden-shifting framework "to determine the proper order and nature of proof for summary judgment."  *Scrivener v. Clark College*, 181 Wn.2d 439, 445, 334 P.3d 541 (2014).  *Accord Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411-12, 430 P.3d 229 (2018), and *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 571, 459 P.3d 371 (2020).

Under the *McDonnell Douglas* test, the employee bears the initial burden of establishing a prima facie case of discrimination, "which creates a presumption of discrimination."  *Scrivener*, 181 Wn.2d at 446.  This is often a "fairly low bar."  *Mackey*, 12 Wn. App. 2d at 584.  If the employee makes a prima facie showing, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Scrivener*, 181 Wn.2d at 446.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  *See also Mikkelsen*, 189 Wn.2d at 533 ("The employer need only introduce 'evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'") (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509) (emphasis in original).  The ultimate burden of persuasion remains with the employee to show the employer intentionally discriminated or retaliated against her.  *Reeves*, 530 U.S. at 143.  Accordingly, if the employer meets its burden of production, the burden shifts back to the employee to produce sufficient evidence to show the employer's purported

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1   nondiscriminatory reason for the adverse employment action was, in fact, a pretext for a

2   discriminatory purpose. *Id.*; *accord Scrivener*, 181 Wn.2d at 446.

3        The provisions of the WLAD are broad and liberally construed by the Court. *Currier v.*

4   *Northland Servs., Inc.*, 182 Wn. App. 733, 741-42, 332 P.3d 1006 (2014) (citing RCW

5   49.60.020). "Claims arising under the WLAD are typically inappropriate for resolution at

6   summary judgment because the WLAD mandates liberal construction and the evidence will

7   generally contain reasonable but competing inferences of both discrimination and

8   nondiscrimination that must be resolved by a jury." *Gamble v. City of Seattle*, 6 Wn. App. 2d

9   883, 887-88, 431 P.3d 1091 (2018) (cleaned up and citations omitted). The Court will, however,

10  grant summary judgment against an employee who "fails to raise a genuine issue of fact on one

11  or more prima facie elements." *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 27, 244 P.3d

12  438 (2010). *See also Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996) (to

13  survive summary judgment employee "must do more than express an opinion or make

14  conclusory statements[,]" and "must establish specific and material facts to support each element

15  of his or her prima facie case.") (citations omitted). Also, where "the plaintiff has produced no

16  evidence from which a reasonable jury could infer that an employer's decision was motivated by

17  an intent to discriminate, summary judgment is entirely proper." *Kuyper v. State*, 79 Wn. App.

18  732, 739, 904 P.2d 793 (1995).

19       Plaintiff here alleges that, following her report of missing controlled substances and the

20  over- and under-medicating of patients, MDC retaliated against her by placing her on unpaid

21  leave and terminating her employment. Dkts. 1-2, ¶¶4.8-4.9. MDC argues this claim should be

22  dismissed given Plaintiff's failure to demonstrate either a prima facie case of retaliation or

23

24

1  pretext.  The Court, as discussed below, concludes that Plaintiff's retaliation claim ultimately

2  fails under the *McDonnell Douglas* framework.

3        1.  <u>Prima Facie Case</u>:

4        An employee establishes a prima facie case of retaliation by showing (1) she took a

5  statutorily protected action; (2) she suffered an adverse employment action; and (3) a causal link

6  exists between her protected activity and the adverse action.  *Cornwell*, 192 Wn. 2d at 411.  In

7  this case, MDC does not dispute that Plaintiff's report of missing controlled substances

8  constitutes protected activity, but asserts the absence of an adverse employment action or a

9  causal link.  The Court addresses the disputed elements below.

10        a.  <u>Adverse employment action</u>:

11        An adverse action involves a "change in employment conditions that is more than an

12  'inconvenience or alteration of job responsibilities.'"  *Kirby v. City of Tacoma*, 124 Wn. App.

13  454, 465, 98 P.3d 827 (2004) (quoting *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th

14  Cir. 1995)).  For purposes of a retaliation claim, "an adverse employment action is adverse

15  treatment that is reasonably likely to deter employees from engaging in protected activity."  *Ray*

16  *v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000).  "The employee must show that a reasonable

17  employee would have found the challenged action materially adverse, meaning that it would

18  have dissuaded a reasonable worker from making or supporting a charge of discrimination."

19  *Boyd v. State Dep't of Soc. and Health Servs.*, 187 Wn. App. 1, 13, 349 P.3d 864 (2015) (citing

20  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (internal quotation marks

21  omitted).  A determination as to whether an action "is materially adverse depends upon the

22  circumstances of the particular case, and 'should be judged from the perspective of a reasonable

23

24

1    person in the plaintiff's position.'" *Tyner v. State*, 137 Wn. App. 545, 565, 154 P.3d 920 (2007)

2    (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71).

3        Plaintiff asserts MDC took adverse action by placing her on unpaid administrative leave,

4    describing suspension without pay as a "powerful deterrent", and terminating her employment.

5    Dkt. 57 at 14.  MDC denies the administrative leave was an adverse employment action, noting it

6    placed Plaintiff on unpaid leave pending investigation into patient and employee allegations and

7    that, after the investigation, she was returned to her same position, with back pay.  Dkt. 52, Ex.

8    23 ("Notice of Administrative Leave" explaining that, if she was found to be not at fault in the

9    investigation, the leave would be converted to paid leave and back wages retroactively paid).

10   MDC notes that the termination occurred only after it brought Plaintiff back from leave and after

11   the filing of additional complaints about her behavior and job performance.

12       Plaintiff shows that, on the day after her written report of missing controlled substances,

13   she was placed on unpaid administrative leave for some two-and-a-half weeks, and that she

14   encountered challenges in recouping her back pay and benefits after she returned to work.  *See,*

15   *e.g.*, Dkt. 57-1, Ex. 13.  A reasonable jury could, with consideration of this evidence, conclude

16   that Plaintiff suffered an adverse employment action.  *See, e.g.*, *Bell v. Boeing Co.*, 599 F. Supp.

17   3d 1052, 1076 (W.D. Wash. 2022) (assuming without deciding that placing an employee on

18   unpaid medical leave was an adverse employment action).  There is, moreover, no question that a

19   termination qualifies as an adverse employment action.  *Id.*  Plaintiff therefore satisfies this

20   element of her prima facie case.

21           b.    <u>Causal link</u>:

22       Causation is proven "'by showing that retaliation was a substantial factor motivating the

23   adverse employment decision.'" *Cornwell*, 192 Wn.2d at 412 (quoting *Allison v. Hous. Auth.*,

24

118 Wn.2d 79, 96, 821 P.2d 34 (1991)).  At the summary judgment stage, Plaintiff's burden to show a causal link between her protected activity and an adverse employment action is "one of production, not persuasion."  *Id.* (citing *Scrivener*, 181 Wn.2d at 445).  "Retaliation need not be the main reason for the employment action."  *Mackey*, 12 Wn. App. 2d at 575 (citation omitted).  "[T]o avoid summary judgment on causation, the employee must show *only* that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision."  *Cornwell*, 192 Wn.2d at 412-13 (emphasis retained).  To make that showing, the employee may rely on the fact "(1) the employee took a protected action, (2) *the employer had knowledge of the action*, and (3) the employee was subjected to an adverse employment action."  *Id.* at 413 (citation omitted; emphasis retained).  Such a showing provides a rebuttable presumption in favor of the employee.  *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 69, 821 P.2d 18 (1991).

MDC denies any causal link between Plaintiff's protected activity and an adverse employment action.  It asserts that the December 18, 2019 Weingarten meeting leading to Plaintiff's leave was scheduled after it received, on December 12th, the report of Plaintiff's failure to properly care for a patient reporting chest pain and statistics showing a continued gap in admissions during the swing shift, and before Plaintiff reported missing controlled substances on December 17th.  *See* Dkt. 52, ¶¶7, 28 (Jacobson asserts that the meeting "would have been scheduled several days earlier" and "had been in the works" since the December 12th patient-related report) & Exs. 20-21.  MDC also observes that it returned Plaintiff from leave, with backpay, after concluding an investigation and that her termination did not occur until February 21, 2020, after MDC received additional grievances and complaints.

1     Plaintiff asserts that she first reported the missing controlled substances to Walters on

2     December 13, 2019, the day of the incident, followed up with him on December 16th, and sent

3     the December 17th email at his request.  Dkt. 57-1, ¶90.  She states that she had "given him logs

4     of the over and under medicating of patients in November, and I had a stack from December to

5     give him[,]" and asserts the absence of any record a Weingarten meeting had been scheduled

6     prior to that report.  *Id*.  Plaintiff also notes that she reported the missing controlled substances to

7     DOH, and asserts that she "became a target of disciplinary actions within a six (6) day . . . period

8     prior to her termination."  Dkt. 57 at 15.

9     Plaintiff's DOH report does not support the existence of a causal link.  As MDC

10    observes, the record in this case contains undisputed evidence showing Plaintiff did not make

11    that report until well after her termination.  *See* Dkt. 46 at 6 (Plaintiff acknowledged in her

12    deposition that she first made a report to DOH on March 9, 2020).  *See also* Dkt. 52, Ex. 40

13    (March 5, 2020 email from Plaintiff to Liddle asking whether it was "still o.k." for her to report

14    the December 2019 "medication errors" to the State).  Plaintiff also fails to provide any

15    documentation associated with a reporting of over- and under-medicating of patients.

16    Plaintiff nonetheless satisfies her burden of production on causation by showing she

17    engaged in protected activity, that MDC had knowledge of that activity, and that she was

18    subjected to an adverse employment action.  First, even without consideration of the parties'

19    assertions as to when Plaintiff first made her report and when MDC scheduled a Weingarten

20    meeting, Plaintiff shows she was placed on administrative leave the day after she made a written

21    report regarding missing controlled substances.  Second, even without a determination as to

22    whether the administrative leave constituted an adverse employment action, Plaintiff shows she

23    was terminated some two months after she made her written report.

24

1    MDC does not undermine this showing by relying on the gap between the report and

2    termination.  "Washington courts have looked to 'the employer's knowledge of the protected

3    activity and the proximity in time between that activity and the termination' to evaluate

4    causation."  *Li v. Northeastern University*, C22-0444-LK, 2023 WL 3722227, at *19, n.19 (W.D.

5    Wash. May 30, 2023) (quoting *Mackey*, 12 Wn. App. 2d at 577; citing *Vasquez v. State*, 94 Wn.

6    App. 976, 985, 974 P.2d 348, 353 (1999) ("Among the factors suggesting retaliatory motivation

7    is proximity in time between the discharge and the protected activity; another factor is

8    satisfactory work performance and evaluations."))  While termination occurring "some length of

9    time" after protected activity is "less likely to reflect an improper motive[,]"  *Wilmot*, 118 Wn.2d

10   at 69, the two months between Plaintiff's protected activity and her termination suffices to

11   establish a causal connection, *see, e.g.*, *Mathews v. Karcher N. Am., Inc.*, No. C21-5732-LK,

12   2023 WL 3318613, at *8 (W.D. Wash. May 9, 2023) (termination and other adverse action "only

13   five to seven weeks" after protected activity occurred in "such close proximity in time" that they

14   supported an inference of causation); *Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1383

15   (W.D. Wash. 2019) (one month between protected activity and adverse employment action was

16   sufficient proximity to establish causation) (citing *Yartzoff v. Thomas*, 809 F.2d 1371 (9th Cir.

17   1987) (finding same for adverse actions some two-to-three months after protected activity)).

18        Nor does MDC undermine Plaintiff's prima facie showing with evidence of the reports

19   received regarding her behavior and performance after she returned from leave.  Plaintiff need

20   only show a reasonable jury could find retaliation was a substantial factor in her termination,

21   *Cornwell*, 192 Wn.2d at 412-13, and it need not have been the main reason, *Mackey*, 12 Wn.

22   App. 2d at 575.  Plaintiff makes that showing and thus satisfies the causation element of her

23   prima facie case.

24

2.    <u>Reason for Adverse Actions</u>:

MDC asserts that it placed Plaintiff on administrative leave and later terminated her employment after receiving reports of her disrespectful behavior and unprofessional conduct from both patients and staff.  MDC, in so doing, satisfies its burden of production by offering a legitimate, nondiscriminatory reason for its adverse actions.

3.    <u>Pretext for Retaliation</u>:

Because MDC offers a legitimate, nondiscriminatory reason for its actions, the burden shifts to Plaintiff to put forth "'specific and substantial'" evidence challenging the credibility of MDC's motives.  *Bell*, 599 F. Supp. 3d at 1069 (quoting *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003)).  To survive summary judgment, Plaintiff must produce "sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination [or retaliation] nevertheless was a substantial factor motivating the employer." *Scrivener*, 181 Wn.2d at 446-47 (citations omitted); *Mackey*, 12 Wn. App. 2d at 572, 583.

Under the first option, an employer's nondiscriminatory reason is pretextual if it (1) has no basis in fact, (2) was not really a motivating factor in the decision, (3) was not temporally connected to the adverse action, or (4) was not a motivating factor in employment decisions for other employees in the same circumstances.  *Scrivener*, 181 Wn.2d at 447.  Under the second, "[a] 'substantial factor' means that the protected characteristic was a significant motivating factor bringing about the employer's decision." *Id.* at 444.  The plaintiff need only show retaliation or discrimination "was a substantial factor in an adverse employment action, not the only motivating factor." *Id.* at 447 ("An employer may be motivated by multiple purposes, both

1   legitimate and illegitimate, when making employment decisions and still be liable under the

2   WLAD."). *Accord Mikkelsen*, 189 Wn.2d at 534.

3       While addressing her prima facie case, Plaintiff offers little to no argument in relation to

4   pretext, and no discussion of the above-described standards. *See, e.g.,* Dkt. 57 at 14-15. The

5   Court, considering all arguments and evidence, finds no genuine issue of material fact either that

6   MDC's legitimate nondiscriminatory reason was pretextual, or that retaliation was a substantial

7   motivating factor.

8       MDC provides evidence to support its decision to place Plaintiff on administrative leave

9   after receiving reports of her disrespectful behavior and unprofessional conduct. MDC also

10  provides evidence to show that it brought Plaintiff back from leave when an investigation failed

11  to yield corroboration for allegations raised against her and later terminated her employment

12  after receiving additional complaints and finding corroborating evidence.

13      Plaintiff does not submit sufficient evidence to show MDC's reason for either the

14  administrative leave or the termination had no basis in fact, was not really a motivating factor,

15  was not temporally connected to adverse actions, or was not a motivating factor in decisions

16  made for other employees in the same circumstances. As discussed above, Plaintiff concedes,

17  wholly or in part, complaints raised against her and otherwise offers her disagreement with

18  accusations made and conclusions reached by MDC. Her disagreement does not suffice to create

19  a genuine issue of material fact. *See, e.g., Mackey*, 12 Wn. App. 2d at 582 (where employer

20  based its action on actual evidence derived from an investigation indicating employee violated

21

22

23

24

1    store policies, the fact the employee disagreed with employer's "conclusions based on that

2    evidence does not mean that those conclusions were not the actual reason for her termination.").[9]

3        Plaintiff likewise fails to show her report of missing controlled substances was a

4    significant motivating factor in MDC's decision.  In this respect, Plaintiff appears to rely almost

5    entirely on the existence of her report and its temporal proximity to adverse acts.  However,

6    unlike a prima facie showing, a mere temporal proximity between a protected activity and an

7    adverse action does not suffice to demonstrate pretext.  *Mackey*, 12 Wn. App. 2d at 584-85

8    (contrasting pretext with the "fairly low bar" of the prima facie case).  "[I]n the pretext step, the

9    employee has the burden of establishing a question of fact as to motivation regardless of the

10   employer's evidence that there was a legitimate, nondiscriminatory reason for the [adverse

11   action]."  *Id*.  (noting that, if the burden did not involve more than "mere temporal proximity . . .

12   the legitimate, nondiscriminatory reason step and the pretext step would be meaningless any time

13   there was temporal proximity between protected activity and termination.")  Plaintiff does not

14   meet this burden.

15       Plaintiff, for example, fails to satisfy her burden in offering unsupported allegations and

16   speculation as to events giving rise to the leave and termination.  While an employee is "'entitled

17   to all reasonable inferences from the evidence, at some point, the reasonable jury cannot continue

18   inferring without actual evidence.'"  *Bell*, 599 F. Supp. 3d at 1078 (noting an absence of

19

20       [9] Similarly, "'[a]n employee's assertion of good performance to contradict the employer's
     assertion of poor performance does not give rise to a reasonable inference of discrimination.'"  *Mackey*,
21   12 Wn. App. 2d at 582 (quoting *Chen v. State*, 86 Wn. App. 183, 191, 937 P.2d 612 (1997)).  *See also*
     *Rahman v. Am. Tire Distrib., Inc.*, No. C13-0410-RSL, 2014 WL 6451296, at *4 (W.D. Wash. Nov. 17,
22   2014) ("The fact that plaintiff feels his performance was satisfactory or that any defects could be justified
     does not raise a genuine issue of material fact at this stage of the analysis: an employee's subjective
     personal judgment of his competence, standing alone, does not establish falsity or pretext."); *Hedenburg*
23   *v. Aramark Am. Food Servs. Inc.*, 476 F. Supp. 2d 1199, 1207 (W.D. Wash. 2007) ("Other than
     Hedenburg's subjective review of her performance, there is no evidence showing Hedenburg was
24   performing up to Aramark's expectations as required by the second element.")

1   evidence demonstrating employer's decisions "were driven, even in part, by a retaliatory

2   motive") (quoting *Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204, 1222 (W.D. Wash. 2018), *aff'd*,

3   777 F. App'x 886 (9th Cir. 2019)).  *See also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82

4   (9th Cir. 1996) (neither a scintilla of evidence, nor mere allegation or speculation suffice to

5   create a factual dispute and defeat summary judgment).  Moreover, in alleging a pattern of

6   harassment and bullying by her co-workers, Plaintiff suggests that adverse actions resulted from

7   issues unrelated to the alleged retaliatory motive.

8       There is, in sum, insufficient evidence from which a reasonable jury could infer that the

9   decision to place Plaintiff on administrative leave and to later terminate her employment was

10  merely pretext concealing a retaliatory motive, or that retaliation was a substantial factor in those

11  decisions.  MDC is therefore entitled to summary judgment on Plaintiff's retaliation claim.

12  C.    Wrongful Termination in Violation of Public Policy

13      Plaintiff also includes a cause of action for wrongful termination in violation of public

14  policy.  Dkt. 1-2, ¶¶4.5-4.7.  To prevail on such a claim, an employee must demonstrate her

15  "'discharge may have been motivated by reasons that contravene a clear mandate of public

16  policy.'"  *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018) (en banc)

17  (quoting *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984)).  This

18  tort is available to all employees, including those dischargeable only for cause and covered by a

19  CBA.  *Smith v. Bates Technical Coll.*, 139 Wn.2d 793, 801-07, 991 P.2d 1135 (2000).

20      Courts, as a general matter, limit these actions to situations in which an employee is

21  terminated for "(1) refusing to commit an illegal act, such as engaging in price fixing; (2)

22  performing a public duty or obligation, such as serving jury duty; (3) exercising a legal right or

23  privilege, such as filing a workers' compensation claim; or (4) engaging in 'whistleblowing'

24

activity." *Bell*, 599 F. Supp. 3d at 1079 (quoting *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989)).  If an action falls into one of these categories, a plaintiff establishes a prima facie case by showing (1) her discharge "may have been motivated by reasons that contravene a clear mandate of public policy"; and (2) her "public-policy-linked conduct was a significant factor" in the decision to terminate her employment.  *Id*. at 1080-81 (citing *Mackey*, 12 Wn. App. 2d at 577-78, and *Martin*, 191 Wn.2d at 725).

If an action does not neatly fit into one of those categories, courts apply an alternative test.  *Martin*, 191 Wn.2d at 723-24.  This test requires an employee to show: (1) a clear public policy exists (the clarity element); (2) discouraging the conduct at issue would jeopardize that public policy (the jeopardy element); (3) the public-policy-linked conduct caused the termination (the causation element); and (4) the defendant cannot offer an overriding justification for the termination (the absence of justification element).  *Id.* (citing *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996)).  *Accord Bell*, 599 F. Supp. 3d at 1079, n.15.

With a prima facie case showing, the employer must satisfy a burden of production to "'articulate a legitimate nonpretextual nonretaliatory reason for the discharge.'"  *Martin*, 191 Wn.2d at 725-26 (quoting *Wilmot*, 118 Wn.2d at 70).  If satisfied, the burden shifts back to the employee "either to show 'that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the [public-policy-linked conduct] was nevertheless a substantial factor motivating the employer to discharge the worker.'"  *Id*. at 726 (quoting *Wilmot*, 118 Wn.2d at 73).

In seeking dismissal of this claim on summary judgment, MDC addresses the above-described standards and argues Plaintiff's inability to establish either a prima facie case or pretext.  *See* Dkt. 50.  MDC asserts the absence of any evidence Plaintiff's report of missing

1   controlled substances was a factor in her termination, and argues her termination was based on

2   cumulative and escalating grievances and complaints filed by both patients and staff.  *Id.*

3          Plaintiff, in response, reiterates the allegations raised in her Complaint almost verbatim.

4   That is, Plaintiff states her termination was in contravention of public policies protecting

5   employees who report illegal acts, misconduct, or unsafe conditions, and a clear mandate to

6   protect healthcare workers who report missing controlled substances and/or unsafe practices in a

7   chemical dependency unit; and that the public policy allowing nurses to report missing

8   controlled substances and unsafe practices is clear, that MDC jeopardized public policy by

9   discouraging the reporting of missing drugs and improper medication management, that her

10  public-policy-linked conduct caused her termination, that her termination had a chilling effect,

11  and that MDC did not offer a justification that would override this important public policy.  Dkt.

12  57 at 13-14; Dkt. 1-2, ¶¶4.5-4.6.  Her remaining argument consists, in full, of the following:

13          In this case, a reasonable jury could find that subsequent to her reporting of
            violations to management of missing narcotics, the over medicating and under
14          medicating of patients in conjunction with MDC not having the proper staff was
            on a more probable than not basis the reason she was terminated.  These actions
15          concerning wrongful termination are highly factual and not suitable for summary
            judgment dismissal, especially in consideration that [her] employment record
16          contradict that[.]

17  Dkt. 57 at 14.[10]

18          Plaintiff alleges she was wrongfully terminated because she reported missing controlled

19  substances and the over- and under-medicating of patients.  This claim, regardless of how it is

20  characterized or categorized in relation to public policy, is properly dismissed on summary

21

22          [10] In her declaration, Plaintiff asserts that, since 2019, MDC has been in violation of DOH
            regulations requiring that it have a Registered Nurse (RN) assigned to the Detox Unit.  Dkt. 57-1, ¶¶20-21
23          & Ex. 6 (attaching copies of WAC 246-341-1100 and WAC 246-341-1131).  She does not, however,
            assert or provide any evidence supporting an assertion that she raised concerns or made any reports
24          regarding this issue either during or subsequent to her employment.

1    judgment for the same reasons discussed in relation to her other claims.  First, Plaintiff does not

2    provide sufficient evidence from which a reasonable jury could infer that the reason given for her

3    termination was merely pretext concealing a motive to terminate her employment because she

4    reported missing controlled substances and/or the over- and under-medicating of patients.

5    Second, Plaintiff does not provide sufficient evidence to show such reporting was a significant or

6    motivating factor in the termination decision.  MDC is, as such, also entitled to dismissal of this

7    claim on summary judgment.

8                                                            CONCLUSION

9            MDC demonstrates Plaintiff's claims for breach of employment agreement, retaliation,

10    and wrongful termination in violation of public policy should be dismissed.  MDC's Motion for

11    Summary Judgment, Dkt. 50, should be GRANTED and Plaintiff's claims should be

12    DISMISSED with prejudice.  A proposed order accompanies this Report and Recommendation.

13                                                            OBJECTIONS

14            Objections to this Report and Recommendation, if any, should be filed with the Clerk and

15    served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

16    Recommendation is signed.  Failure to file objections within the specified time may affect your

17    right to appeal.  Objections should be noted for consideration on the District Judge's motions

18    calendar for the third Friday after they are filed.  Responses to objections may be filed within

19    **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be

20    ready for consideration by the District Judge on **February 2, 2024**.

21            Dated this 17th day of January, 2024.

22

23                                                            S. KATE VAUGHAN
                                                             United States Magistrate Judge

24